IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN MCARDLE, an individual, on behalf of himself, the general public, and those similarly situated, | No. 09-cv-1117 CW |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION |
| v. | |
| AT&T MOBILITY LLC; NEW CINGULAR WIRELESS PCS LLC; and NEW CINGULAR WIRELESS SERVICES, INC., | (Dkt. No. 300, 301, 323, 333) |
| Defendants. | |

_____/

Plaintiff Steven McArdle sues Defendants AT&T Mobility LLC, New Cingular Wireless PCS LLC and New Cingular Wireless Services, Inc. (collectively AT&T), alleging that AT&T deceptively charged exorbitant fees for international cellular telephone service. McArdle now moves to certify two putative classes.  For the reasons explained below, the Court grants the motion in part and denies it in part.

BACKGROUND

AT&T is a cellular telephone service provider.  It owns New Cingular Wireless PCS LLC and New Cingular Wireless Services, Inc. Second Am. Compl. (SAC) ¶ 7.  McArdle has been an AT&T customer since 2004.  Id. ¶ 32.

In 2005 AT&T started automatically providing its California customers' cell phones with international roaming capability. This allowed customers to use their phones outside the United States without first purchasing a special international roaming

**United States District Court**
For the Northern District of California

plan.  McArdle alleges, however, that AT&T misled customers who traveled abroad about the cost of unanswered incoming calls.

Within the United States, AT&T did not charge for incoming calls that customers did not answer, even if the caller left a voicemail message.  Decl. of Seth A. Safier, Ex. A, Mahone-Gonzalez Dep. at 221:2-25; Ex. B, Papner Dep. at 40:2-24 (Dkt. Nos. 151-1, 151-2).  Outside the United States, it was a different story.  If a customer turned on his or her phone even once while abroad, the phone "registered" with a foreign cellular network. If the customer then received a call, he or she might incur charges at international roaming rates, even if the call was not answered and even if the caller did not leave a voicemail.[1] Mahone-Gonzalez Dep. at 139:23-25; Papner Dep. at 38:15-19. Worse, if the caller left a voicemail, the customer could be charged twice——once for the incoming leg of the call and again to have the voicemail "deposited" into AT&T's domestic voicemail platform.  AT&T internally called this double-billing the "trombone effect."  Papner Dep. at 193:16-194:5.

Not all customers incurred these trombone effect charges.  In fact, it was AT&T's policy not to charge for the second leg of an unanswered international call if a foreign cellular network "flagged" the records.  Papner Dep. 190:17-191:8.  A 2009 internal

---

[1] AT&T points out that if a customer's phone registered with a foreign network but then remained powered down for some length of time, the phone "typically" de-registered from the foreign network.  Decl. of Aaron Cato ¶ 6 (Dkt. No. 154).  Whether that happened and how long the process took depended on the foreign network.  Id.

United States District Court
For the Northern District of California

AT&T study found that only fourteen percent of unanswered international calls were not flagged.  Decl. of Kevin Ranlett, Ex. 2, Cato Dep. at 110:5-18 (Dkt. No. 161-3).  When customers who were charged complained to AT&T, the company often refunded them. Mahone-Gonzalez Dep. at 82:6-16.  And AT&T eventually developed and deployed technology aimed at helping customers avoid trombone effect charges altogether.  Supp. Decl. of Charles Carter, Jr. ¶¶ 5-7 (Dkt. No. 323-9).  Still, customers who did incur charges for unanswered international calls during the proposed class period generated considerable revenue for AT&T: the company estimates that average monthly revenue for international voicemail deposits by California customers was nearly $1.2 million, totaling almost $60 million for the duration of the class period.  Supp. Decl. of Pamela Papner ¶ 12 (Dkt. No. 17).

During the class period, AT&T provided various disclosures about how it billed internationally-roaming customers for unanswered incoming calls.  Customers who visited the AT&T website, for instance, might have found an international rate plan brochure, and if they read the brochure to the end they would have learned that "[w]hen outside the U.S., Puerto Rico and USVI, you will be charged normal international roaming airtime rates when incoming calls are routed to voicemail, even if no message is left."  Safier Decl., Ex. W (Dkt. No. 151-13); Decl. of Harry Bennett, Ex. 18 (Dkt. No. 163-17).  A more user-friendly "Frequently Asked Questions" page in May 2008 made a similar disclosure:

> Q. How am I charged for Voicemail calls while roaming internationally?

A. Voicemail calls are charged as follows:

When your device is on:

Calls that you do not answer that are routed to the AT&T voicemail system will be charged as an international roaming incoming call to your device.

In addition, the foreign carrier's routing of that call to the AT&T voicemail system may generate an outgoing call charge from your device's location to the U.S.

These charges apply even if the caller disconnects from the voicemail system without leaving a message.

If your device is turned off or in flight mode and the wireless network is off:

[...]Since the network does not try to deliver the call to you in a foreign country, there are no international roaming charges.

Decl. of Harry Bennett, Ex. 17 (Dkt. No. 163-16).  Before 2008, however, the same FAQ webpage was less detailed: "While roaming internationally, calls deposited to your voicemail (when phone is 'active' and if busy/no answer) will incur twice the per minute charge."  Id. Ex 14.

Customers may have also learned about the billing policy by speaking to employees at AT&T stores or by calling the company's telephone "Customer Care" center.  AT&T did not provide employees with a standard script to follow when discussing the matter, Mahone-Gonzalez Dep. at 35-36, 46-47, and employees did not keep detailed records of those conversations, Decl. of Mahone-Gonzalez ¶¶ 5-7 (Dkt. No. 158).

Whatever other information customers may have seen, each new customer from 2005 onwards signed a Wireless Customer Agreement, into which was incorporated AT&T's Terms of Service.  Papner Dep. at 20:15-20, 27:20-23; Decl. of Debra Figueroa, Ex. 2 ("This

4

Agreement, including . . . terms of service for wireless products
. . . make[s] up the complete agreement between you and AT&T
. . . .") (Dkt. 229).  From 2005 through January 2009, AT&T
published multiple versions of the Terms of Service, all of which
included an identical description of how AT&T would charge
customers for calls they received while outside the United States:
"Chargeable time may also occur from other uses of our facilities,
including by way of example, voicemail deposits and retrievals and
call transfers."  Decl. of Richard Rives, Exs. 1-5 (Dkt. No. 168);
Papner Dep. 35:5-36:17.  This is the language McArdle hones in on
as being allegedly deceptive.

The Terms of Service incorporated by reference the AT&T's
rate plan brochures.  See, e.g., Rives Decl., Ex. 1 ("This
Agreement . . . [and] the terms included in the rate brochure(s)
describing your plan and services . . . make up the complete
agreement between you and Cingular . . . .").  Customers may have
received a domestic rate plan brochure during a visit to an AT&T
store, where employees regularly handed them out.  Decl. of David
Albright ¶ 15 (Dkt. No. 320-4).  AT&T published different versions
of those brochures between 2005 and 2009 but most described the
relevant policy under the heading "Caller ID Blocking."  The
brochures explained:

> Caller ID Blocking: Your billing name may be displayed
> along with your wireless number on outbound calls to
> other wireless and landline phones with Caller ID
> capability.  Contact customer service for more
> information on blocking the display of your name and
> number.  **You may be charged for both an incoming and an
> outgoing call when incoming calls are routed to
> voicemail, even if no message is left**.

**United States District Court**
For the Northern District of California

Decl. of Robert Harding, Exs. 1, 3-7 (emphasis added) (Dkt. No. 164). McArdle contends that the placement of that disclosure under a seemingly unrelated heading was misleading.

McArdle says he was one of thousands of California customers who were misled by AT&T. In March 2008, McArdle traveled to Italy for a bicycle tour. He wanted to send text messages to family and friends during his trip but before leaving he tried to learn more about how much that would cost. Among other things, he visited AT&T's website and called the Customer Care line to ask about international roaming charges. Safier Decl., Ex. C, McArdle Dep. at 105:16-25, 110:3-20, 224:8-11 (Dkt. No. 151-3). Based on what he learned, he says, he kept his phone on during the trip but did not answer any incoming calls. He was later surprised when AT&T charged him $3.87 (reflecting a higher international per-minute rate) for the calls he received but did not answer. SAC ¶ 36.

McArdle sued, asserting claims under California law for unfair business practices, false advertising, violation of the Consumers Legal Remedies Act (CLRA), and fraud. The Court previously denied without prejudice an earlier class certification motion. Dkt. No. 191. Later the Court granted AT&T's motion to compel arbitration based on a mandatory arbitration provision in the Wireless Customer Agreement. Dkt. No. 257. The arbitrator ruled in AT&T's favor but this Court later vacated the arbitral award in light of the California Supreme Court's decision in McGill v. Citibank, 2 Cal. 5th 945 (2017). Dkt. No. 287. McArdle then renewed his motion for class certification.

McArdle now seeks certification of two classes:

(1) The "Roaming Class": All California residents who, any time between February 6, 2005 and January 31, 2009, were charged international roaming fees by Defendants for unanswered incoming calls to their U.S.-based mobile numbers; and

(2) The "Waiver Class": All California residents who, from May 29, 2005 through the date of class notice, were customers of Defendants pursuant to a wireless telephone services contract that purported to bar customers from bringing a claim for injunctive relief on behalf of the general public.

McArdle Renewed Mot. for Class Cert. at v.  McArdle seeks certification of the Roaming Class under Rule 23(b)(3) and of the Waiver Class under Rule 23(b)(2).[2]  AT&T opposed the motion and the Court heard arguments from both sides at a hearing on June 26, 2018.

LEGAL STANDARD

A plaintiff seeking to represent a class first must satisfy the threshold requirements of Rule 23(a).  Rule 23(a) provides that a case is appropriate for certification as a class action if:

1) the class is so numerous that joinder of all members is impracticable;

2) there are questions of law or fact common to the class;

3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

---

[2] McArdle's motion asked the Court to certify the Waiver Class under Rule 23(b)(3) but he changed course in his reply brief, arguing for the first time that certification was warranted under Rule 23(b)(2).  For the reasons described below, the Court denies certification under both subsections.

United States District Court
For the Northern District of California

A plaintiff must also meet the requirements of one of the subsections of Rule 23(b).

Subsection (b)(2) applies where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). "These requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." Parsons v. Ryan, 754 F.3d 657, 688 (9th Cir. 2014). "[T]he primary role of this provision has always been the certification of civil rights class actions." Id. at 686 (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (1997)).

Subsection (b)(3) permits certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are intended "to cover cases 'in which a class action would achieve economies of time, effort, and expense . . . without sacrificing procedural fairness or bringing about other undesirable results.'" Amchem Prods., 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment). Plaintiffs seeking class certification bear the burden of demonstrating that they satisfy each Rule 23 requirement at issue. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir.

United States District Court
For the Northern District of California

1977).  In general, the court must take the substantive allegations of the complaint as true.  Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975).  The court must conduct a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (quoting Falcon, 457 U.S. at 160-61).  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped." Dukes, 564 U.S. at 351.  To satisfy itself that class certification is proper, the court may consider material beyond the pleadings and require supplemental evidentiary submissions by the parties. Blackie, 524 F.2d at 901 n.17.  "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'" Aburto v. Verizon California, Inc., No. 11-cv-3683-ODW-VBKX, 2012 WL 10381, at *2 (C.D. Cal. 2012) (quoting Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011)), abrogated on other grounds as recognized by Shiferaw v. Sunrise Sen. Living Mgmt., Inc., No. 13-cv-2171-JAK, 2014 WL 12585796, at *24 n.16 (C.D. Cal. 2014).  Ultimately, it is in the district court's discretion whether a class should be certified.  Molski v. Gleich, 318 F.3d 937, 946 (9th Cir. 2003); Burkhalter Travel Agency v. MacFarms Int'l, Inc., 141 F.R.D. 144, 152 (N.D. Cal. 1991).

DISCUSSION

I.  Administrative Motions to File Materials Under Seal

The Court first addresses three administrative motions to file materials under seal.  First, McArdle moves for leave to file

9

United States District Court
For the Northern District of California

under seal an unredacted version of his class certification motion and Exhibits 4, 8 and 9 to the Supplemental Declaration of Seth Safier.  Dkt. No. 300.  The class certification motion and Exhibit 4, which is an excerpt of a transcript of the deposition of Aaron Cato, contain materials that AT&T designated as confidential pursuant to a stipulated protective order.  Exhibits 8 and 9 are Steven McArdle's AT&T billing records, so they contain sensitive personal information.

Second, AT&T moves for leave to file under seal an unredacted version of its opposition to the class certification motion.  Dkt. No. 323.  As part of the same request, AT&T wishes to seal Exhibits 2 through 5 to the Supplemental Declaration of Kevin Ranlett.  Exhibit 2 is an excerpt of the Caroline Mahone-Gonzalez deposition transcript and Exhibits 3 and 4 are the original and supplemental declarations of Charles Carter, Jr., respectively. Exhibit 5 contains documents from an arbitration arising from a related case, Thelian v. AT&T Mobility LLC, 10-cv-3440-CW, some of which contain sensitive personal information related to the plaintiff in that case.

Third, McArdle moves for leave to file under seal an unredacted version of his reply brief as well as Exhibits 14 and 17 to the Reply Declaration of Seth Safier, all of which contain materials that AT&T designated as confidential pursuant to the stipulated protective order.  Dkt. No. 333.  Exhibit 14 is an excerpt of the Mahone-Gonzalez deposition transcript and Exhibit 18 describes AT&T's document retention policies.

There is a "strong presumption in favor of access to court records."  Ctr. for Auto Safety v. Chrysler Grp., LLC, 809 F.3d

1092, 1096 (9th Cir.) (citation omitted), cert. denied sub nom.
FCA U.S. LLC v. Ctr. for Auto Safety, 137 S. Ct. 38 (2016).
Accordingly, "[a] party seeking to seal a judicial record then
bears the burden of overcoming this strong presumption by meeting
the 'compelling reasons' standard." Id. (quoting Kamakana v. City
& Cnty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006)). "What
constitutes a 'compelling reason' is 'best left to the sound
discretion of the trial court.'" Id. at 1097 (quoting Nixon v.
Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978)). Justification
to seal is not established simply by showing that the document is
subject to a protective order or by stating in general terms that
the material is considered to be confidential, but rather must be
supported by a sworn declaration demonstrating with particularity
the specific harm or prejudice that would result from disclosure.
See Civil L.R. 79-5(d); Kamakana, 447 F.3d at 1180, 1186.
Requests to seal must be narrowly tailored to seek sealing only of
sealable material. Civil L.R. 79-5(b).

Some of the documents submitted contain sensitive personal
information but most of the relevant materials concern what AT&T
describes as confidential business information. This category
includes portions of both parties' briefs and the supporting
exhibits, which describe among other things AT&T's billing
practices, technical capabilities and customer service procedures.
The Court acknowledges that it previously granted requests to seal
the same or similar materials during briefing of McArdle's
original class certification motion. Dkt. Nos. 145, 147 and 188.
Having reviewed the matter, however, the Court concludes that AT&T

United States District Court
For the Northern District of California

has not persuasively argued that compelling reasons exist to overcome the strong presumption against sealing those documents.

AT&T asks the Court to seal significant portions of the parties' motion papers, including passages discussing matters at the heart of this litigation.  For instance, lines twenty-three through twenty-four on page two of McArdle's opening brief read, "During the class period, customers who used AT&T's services in the U.S. did not pay for incoming calls, unless they answered the calls."  AT&T says that passage contains "confidential commercial information concerning customer billing practices and procedures."  Decl. of Kevin Ranlett § 7(b) (Dkt. No. 302).  AT&T also wishes to seal passages in the same brief describing the thousands of complaints the company received about its billing practices as well as its custom of refunding aggrieved customers.  AT&T says the information is confidential because it relates to "customer service policies, procedures, and internal investigations [and] billing and international-roaming policies."  Id. § 7(j), (m).  AT&T might prefer to keep some of McArdle's allegations confidential, but that is not a reason to keep the briefs——or this Court's discussion of them——secret from the public.  AT&T does not demonstrate with particularity any specific harm that might come from disclosure of the information it seeks to file under seal, and its arguments for sealing the briefs and supporting exhibits are unpersuasive.

The Court grants the first motion to seal (Dkt. No. 300) only as to Exhibits 8 and 9 to the Supplemental Safier Declaration; grants the second motion to seal (Dkt. No. 323) only as to Sub-Exhibits 4 through 9 of Exhibit 5 to the Supplemental Ranlett

**United States District Court**
For the Northern District of California

Declaration (i.e., the documents containing sensitive personal information related to Kenneth Thelian); and grants the third motion to seal (Dkt. No. 333) only as to pages 209 through 211 of the Mahone-Gonzalez deposition, which contain personal information related to McArdle.  In all other respects, the Court denies the three motions to seal.

## II.   The Roaming Class May Be Certified

### A.   The Roaming Class Satisfies Rule 23(a)

#### 1.   Numerosity

McArdle does not present the Court with evidence of the exact size of the Roaming Class but AT&T does not dispute that it is "so numerous that joinder of all members is impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  The Court finds that McArdle satisfies the numerosity requirement.

#### 2.   Commonality

Rule 23 contains two related commonality provisions.  Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(b)(3), in turn, requires that such common questions predominate over individual ones.  The Ninth Circuit has explained that Rule 23(a)(2) does not preclude class certification if fewer than all questions of law or fact are common to the class:

> The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively.  All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir.1998).

Rule 23(b)(3), in contrast, requires not just that some common questions exist, but that those common questions predominate. In Hanlon, the Ninth Circuit discussed the relationship between Rule 23(a)(2) and Rule 23(b)(3):

> The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.

Id. at 1022 (citations and internal quotation marks omitted).

Although AT&T disputes that this case satisfies Rule 23(a)'s commonality requirement, its arguments are better understood in terms of the predominance inquiry under Rule 23(b)(3). The Roaming Class members were all charged at international roaming rates for unanswered incoming calls and all were subject to the same Terms of Service and domestic rate plans. This is sufficient to satisfy the permissive commonality test for Rule 23(a)(2).

        3.   Typicality

Rule 23(a)(3)'s typicality requirement provides that a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Falcon, 457 U.S. at 156 (quoting E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)) (internal quotation marks omitted). The purpose of the requirement is "to assure that the interest of the named representative aligns with the interests of

14

the class." <u>Hanon</u>, 976 F.2d at 508.  Rule 23(a)(3) is satisfied
where the named plaintiffs have the same or similar injury as the
unnamed class members, the action is based on conduct which is not
unique to the named plaintiffs, and other class members have been
injured by the same course of conduct.  <u>Id.</u>  Class certification
is inappropriate, however, "where a putative class representative
is subject to unique defenses which threaten to become the focus
of the litigation."  <u>Id.</u> (quoting <u>Gary Plastic Packaging Corp. v.</u>
<u>Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d
Cir. 1990).

McArdle's claims, like those of the rest of the Roaming
Class, are based on AT&T's alleged practice of misleading
customers as to the cost for unanswered calls received outside the
United States.  SAC  ¶¶ 32-37.  His claims as representative are
at least facially "reasonably co-extensive with those of the
absent class members."  <u>Hanlon</u>, 150 F.3d at 1020.

AT&T contends that McArdle is subject to a unique
counterclaim because he allegedly defrauded AT&T into giving him
unwarranted discounts.  Billing records reveal that McArdle
enjoyed discounts reserved for government employees and employees
of The Gap, a clothing retailer.  McArdle never worked for the
government and has not worked for The Gap since 2016.

As noted above, "class certification is inappropriate where a
putative class representative is subject to unique defenses which
threaten to become the focus of the litigation."  <u>Hanon</u>, 976 F.2d
at 508 (citation omitted).  The Court, however, is not persuaded
that McArdle's alleged fraud on AT&T is enough to defeat
typicality.  McArdle says AT&T's opposition was the first time he

United States District Court
For the Northern District of California

learned of any improper discounts he may have received, despite
nearly nine years of litigation and despite propounding broad
document requests during pre-certification discovery concerning
his account with AT&T.  More importantly, although AT&T offers
various account statements and internal records confirming that
McArdle received the discounts, the company offers no evidence
that McArdle ever asked for those discounts, much less that he
asked with the intent to defraud AT&T.  <u>See</u> Decl. of Michael
Merced ¶¶ 6-10, Exs. 1-6.  At least for the moment, AT&T's
accusations against McArdle are too speculative to defeat
typicality.  <u>See</u> <u>Ramirez v. Greenpoint Mortg. Funding, Inc.</u>, 268
F.R.D. 627, 638 n.7 (N.D. Cal. 2010) (finding typicality despite
potential unclean hands defense that appeared unlikely to succeed
on the merits).

    4.  Adequacy

A class representative must "fairly and adequately protect
the interests of the class." Fed. R. Civ. P. 23(a)(4).  To
determine whether the representative meets this standard, a court
asks, "(1) Do the representative plaintiffs and their counsel have
any conflicts of interest with other class members, and (2) will
the representative plaintiffs and their counsel prosecute the
action vigorously on behalf of the class?" <u>Staton v. Boeing Co.</u>,
327 F.3d 938, 957 (9th Cir. 2003) (citing <u>Hanlon</u>, 150 F.3d at
1020).

AT&T advances two arguments for why McArdle and his counsel
are inadequate but neither is persuasive.  First, AT&T accuses
McArdle of having a credibility problem that creates a conflict
between him and the class.  Not only did McArdle wrongfully obtain

United States District Court
For the Northern District of California

discounts, AT&T says, but the arbitrator found his claim that he would have used his phone differently in Italy had he known about the potential trombone effect charges to be "not credible."  Decl. of Kevin Ranlett, Ex. 24 (Dkt. No. 274-1).  The class representative's credibility is indeed a relevant factor in the adequacy inquiry, but "[o]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." Harris v. Vector Mktg. Corp., 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (citation omitted).  Perhaps a jury will not be persuaded by McArdle's testimony, but AT&T's argument is less about adequacy or typicality than it is an attack on the merits of his case.

Second, AT&T contends that McArdle's friendship with one of his lawyers creates a conflict.  McArdle acknowledged at a deposition that he is close friends with Seth Safier, one of his attorneys, and AT&T notes that any recovery McArdle could hope to obtain would be dwarfed by the windfall Mr. Safier and others at his firm might earn in fees.

A close relationship between the named plaintiff and his counsel can create a conflict but it does not have to.  See Zeisel v. Diamond Foods, Inc., No. 10-cv-1192-JSW, 2011 WL 2221113, at *9 (N.D. Cal. 2011) (lacking evidence of an actual conflict, plaintiff's friendship with one of his lawyers did not defeat adequacy).  The question is one of degree.  AT&T cites various cases in which a plaintiff-lawyer relationship precluded class certification but those cases are distinguishable because the relationships often highlighted other, more serious weaknesses in

the plaintiffs' cases.  See Bohn v. Pharmavite, LLC, No. 11-cv10430-GHK AGRX, 2013 WL 4517895, at *2-4 (C.D. Cal. 2013) (plaintiff's inconsistent statements about why she purchased product in question suggested potential lack of standing, exacerbating concern about friendship with counsel); see also English v. Apple Inc., No. 14-cv-1619-WHO, 2016 WL 1188200, at *13 (N.D. Cal. 2016) (two of three original named plaintiffs were employees of proposed class counsel); Mowry v. JP Morgan Chase Bank, N.A., No. 06-cv-4312, 2007 WL 1772142, at *4 (N.D. Ill. 2007) (plaintiff said in deposition he was "here to represent [the law firm] and to represent their point in the case[.]").  The Court is not convinced that McArdle's friendship with one of his lawyers comparably undermines his ability adequately to represent absent class members.

     The Court finds that McArdle and his counsel are adequate to represent the Roaming Class.

          B.   The Roaming Class Satisfies Rule 23(b)(3)

               1.   Common Questions Predominate

     AT&T attacks McArdle's expert witness, James F. Murphy, upon whose testimony McArdle relies to establish the certifiability of the Roaming Class.  AT&T asks the Court to strike Murphy's declaration under Federal Rule of Evidence 702 because Murphy is not an expert in AT&T's call and billing records systems and because Murphy's proposed method for identifying class members and calculating damages is unreliable.

     Supreme Court dicta suggests that when a plaintiff offers expert testimony in support of a class certification motion, a district court must apply the evidentiary standard laid out in

United States District Court
For the Northern District of California

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), to determine the admissibility of that testimony.  See Dukes, 564 U.S. at 354 ("[T]he District Court concluded that Daubert did not apply to expert testimony at the certification stage of class-action proceedings.  We doubt that is so . . . .") (internal citation omitted).  The Ninth Circuit has approved of this rule. See Ellis, 657 F.3d at 982 (district court correctly applied Daubert on class certification motion).  Under that same Ninth Circuit precedent, the court must apply Daubert on the question of admissibility and the "rigorous analysis" standard of Rule 23 on the question of class certification.  See id.  In other words, the Court must ask both if the expert testimony is admissible and if it is persuasive.  See id.

Rule 702 and Daubert require the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589.

Rule 702 permits an expert to offer opinion testimony on a subject if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

To evaluate the reliability of expert opinion testimony, a court must consider the factors set out in Daubert, which include "whether the theory or technique in question can be (and has been)

**United States District Court**
For the Northern District of California

tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community." 509 U.S. at 593-94. The "test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

AT&T contends that Murphy does not qualify as an expert and that his methods are unreliable but neither argument is persuasive. On Murphy's credentials, AT&T points to his lack of a university degree and unfamiliarity with AT&T's particular internal systems. Yet a witness "can qualify as an expert through practical experience in a particular field, not just through academic training." Rogers v. Raymark Indus., Inc., 922 F.2d 1426, 1429 (9th Cir. 1991). During Murphy's nearly twenty-year tenure at a telecommunications software firm, he has worked and become familiar with the Call Detail Records (CDRs), Transferred Account Procedure (TAP) records, and other industry-standard materials from which he says he can identify class members. Decl. of James F. Murphy ¶¶ 1-2, 21-26 (Dkt. No. 138).[3] The Court is satisfied that this practical experience is sufficient to qualify

---

[3] Murphy signed his declaration in 2010, in support of McArdle's original class certification motion. At that time, Murphy said he had worked in the telecommunications industry for over ten years. Murphy Decl. ¶ 1.

United States District Court
For the Northern District of California

Murphy as an expert, even if he has limited experience with AT&T's particular systems and practices.

Murphy proposes to use a mix of TAP records, CDRs, and billing records to identify class members and calculate damages. Murphy appears to have developed this proposal specifically for this litigation and he has never tested his ideas, much less subjected them to peer review.  AT&T is correct that those facts cut against the admissibility of the testimony.  See Murray v. S. Route Mar. SA, 870 F.3d 915, 923–24 (9th Cir. 2017).  Yet the Daubert standard is "fluid and contextual."  Id. at 923.  What might have been necessary in a case like Daubert, which concerned pharmaceuticals and biology, might be less so in a case about cell phone records.  AT&T insists that Murphy's task is technologically daunting, if not impossible, but the company's own customer service representatives seem to have been able to identify and refund charges for unanswered international calls without much difficulty when customers complained, as they apparently did regularly.  Safier Reply Decl. Ex. 14, Mahone-Gonzaeles Dep. at 103:9–104:11, 163:20–164:6, 208:21–211:5 (Dkt. No. 333-5).

The Court is satisfied that Murphy qualifies as an expert and that his proposed method for identifying class members and damages is sufficiently reliable to be admissible under Rule 702. Furthermore, Murphy's testimony shows "damages are capable of measurement on a classwide basis," notwithstanding that his method

remains largely untested.   Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013).[4]

---

[4] AT&T's argument that the Roaming Class should be defined to exclude customers who received refunds or credits is well taken, as is the company's argument that claims under the CLRA must be limited to customers who used their phones for personal (i.e., non-business) purposes.   See Cal. Civ. Code § 1761(d).   Murphy's proposal seems reasonably capable of identifying the members of a class modified on those terms.

AT&T also argues that common questions do not predominate as to whether absent class members relied on any alleged misrepresentations.  AT&T contends that the Court may not presume reliance by absent class members because they were not exposed to uniform representations about the international roaming policy. This question requires the Court to address the elements of each of McArdle's claims.  See Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action.") (internal quotation marks and citation omitted).

### a. UCL and FAL

California's Unfair Competition Law (UCL) prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  The UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law.  Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000).  "A violation of the UCL's fraud prong is also a violation of the false advertising law."  Pfizer Inc. v. Superior Court, 182 Cal. App. 4th 622, 630 n.4 (2010) (citations omitted).  "A fraudulent business practice is one in which members of the public are likely to be deceived."  Morgan v. AT&T Wireless Servs., Inc., 177 Cal. App. 4th 1235, 1254 (2009).

McArdle asserts that AT&T violated the UCL and FAL by deceiving customers as to the cost of unanswered calls received while outside the United States.  AT&T counters that proving these claims requires inquiries into the specific disclosures each class

United States District Court
For the Northern District of California

member received.  The company notes that customers may have received different information about the relevant policy from the internet, AT&T employees or other sources.

As both sides acknowledge, "[r]elief under the UCL is available without individualized proof of deception, reliance and injury." In re Tobacco II Cases, 46 Cal. 4th 298, 320 (2009). The individual circumstances of each class member do not need to be examined because only the named plaintiff must demonstrate standing. See Plascencia v. Lending 1st Mortg., 259 F.R.D. 437, 448 (N.D. Cal. 2009).  In the class action context, so long as "the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." Mass. Mut. Life Ins. Co. v. Superior Court, 97 Cal. App. 4th 1282, 1292-93 (2002).

Here, although AT&T published various disclosures in various forms, every Roaming Class member acknowledged receipt of the Terms of Service, and every version of that document during the class period made the same disclosure: "Chargeable time may also occur from other uses of our facilities, including by way of example, voicemail deposits and retrievals and call transfers." Rives Decl., Exs. 1-5; Papner Dep. 35:5-36:17.  Additionally, every Roaming Class Member was subject to the rate plan brochures, which buried information about fees for unanswered international calls under an unrelated heading.  Harding Decl., Exs. 1, 3-7.  If a jury were to find those disclosures were likely to deceive the public, then McArdle could succeed on his UCL and FAL claims without establishing the individual reliance of absent class members.  AT&T might be able to defeat the showing of causation as

to some class members but that "does not transform the common question into a multitude of individual ones." Mass. Mut., 97 Cal. App. 4th at 1292-93.

Whether the Terms of Service and rate plan brochures were likely to deceive the public——taking into account all of the other information that was available about AT&T's international roaming fees——is a question that ties together all members of the Roaming Class. Those materials formed the authoritative, binding expression of AT&T's policies and they would have been the logical place for any customer to look when investigating how to use his or her phone while traveling abroad. The Court is satisfied that common issues predominate.

AT&T also contends that under Poulos v. Caesars World, Inc., 379 F.3d 654, 666-67 (9th Cir. 2004), the Court may not presume the reliance of absent class members because McArdle's claims involve a mix of alleged affirmative misrepresentations and omissions. In Poulos, the Ninth Circuit noted that the presumption of reliance "typically has been applied in cases involving securities fraud and, even then, the presumption applies only in cases primarily involving 'a failure to disclose'——that is, cases based on omissions as opposed to affirmative misrepresentations." 379 F.3d at 666 (citing Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972)).

Even accepting that McArdle's claims depend on a mix of misrepresentations and omissions, Poulos does not control. That case involved the causation requirement for a putative class alleging civil violations of the Racketeer Influenced and Corrupt Organizations Act; the Ninth Circuit was careful to note that its

United States District Court
For the Northern District of California

holding was "both narrow and case-specific." Id.; see also Wolph v. Acer Am. Corp., No. 09-cv-1314-JSW, 2012 WL 993531, at *3 (N.D. Cal. 2012) (Poulos not applicable to putative California class action); but see Gonzalez v. Proctor & Gamble Co., 247 F.R.D. 616, 623-26 (S.D. Cal. 2007) (citing Poulos to support refusal to certify putative California class but finding lack of predominance due to lack of uniform alleged misrepresentations by defendant). California law, by contrast, is clear that "if the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class. Defendants may, of course, introduce evidence in rebuttal." Vasquez v. Superior Court, 4 Cal. 3d 800, 814 (1971).

Finally, AT&T's argument that the Roaming Class is overbroad because it includes members who cannot seek injunctive relief is not persuasive. Thanks to AT&T's efforts, Roaming Class members who are still customers are not likely to incur charges for unanswered international calls in the future, Supp. Carter Decl. ¶¶ 5-7, and class members who left AT&T are obviously no longer at risk, either. According to AT&T, the potential presence of current and former customers in the class means that many class members lack standing to pursue injunctive relief, and that the class as a whole is therefore overbroad. Yet McArdle does not need class certification to pursue injunctive relief against an unfair business practice; he can achieve such a remedy in his capacity as an individual plaintiff. See McGill, 2 Cal. 5th at 959.

United States District Court
For the Northern District of California

b. CLRA and Fraud

"The CLRA makes unlawful certain 'unfair methods of competition and unfair or deceptive acts or practices' used in the sale of goods or services to a consumer." Wilens v. TD Waterhouse Grp., Inc., 120 Cal. App. 4th 746, 753 (2003) (quoting Cal. Civ. Code § 1770(a)).  Section 1780(a) provides, "Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action" under the CLRA.  Thus, to pursue a CLRA claim, plaintiffs must have been "exposed to an unlawful practice" and "some kind of damage must result." Meyer v. Sprint Spectrum L.P., 45 Cal. 4th 634, 641 (2009).

A plaintiff may recover for common law fraud if he or she is the victim of a misrepresentation, whether by affirmative misrepresentation or by a deceptive or misleading omission. Miller v. Fuhu Inc., No. 2:14-cv-6119-CAS-AS, 2015 WL 7776794, at *15 (C.D. Cal. 2015) (citations omitted).

AT&T asserts that individual issues predominate on the CLRA and fraud claims for the same reasons discussed above.  Unlike the UCL and FAL, the CLRA requires individualized proof of injury caused by the defendant's unlawful conduct.  But the distinction is not significant because CLRA "[c]ausation, on a class-wide basis, may be established by materiality." In re Vioxx Class Cases, 180 Cal. App. 4th 116, 129 (2009) (citing Mass. Mut., 97 Cal. App. 4th at 1292-93.).  "As long as Plaintiffs can show that material misrepresentations were made to the class members, an inference of reliance arises as to the entire class." Keilholtz, 268 F.R.D. at 343.  A similar presumption of reliance is available

for California common law fraud claims.  See Plascencia v. Lending
1st Mortg., No. 07-cv-4485-CW, 2011 WL 5914278, at *1-2 (N.D. Cal.
2011).  In both cases, materiality is determined from an objective
perspective.

The Court rejects AT&T's argument for the same reasons
discussed above concerning the UCL and FAL.  Common issues will
predominate on the CLRA and fraud claims because McArdle can
establish at least an inference of class-wide reliance by showing
that AT&T's disclosures were objectively materially misleading.

> ### 2.   Superiority

Finally, the Court finds that adjudicating class members'
claims in a single action would be superior to maintaining a
multiplicity of individual actions involving similar legal and
factual issues.  AT&T's case against superiority essentially
restates its argument that individual questions will predominate.
The Court rejects that argument for the reasons stated above and
finds that McArdle satisfies Rule 23(b)(3).

## III. The Waiver Class May Not Be Certified

McArdle's motion sought certification for the Waiver Class
under Rule 23(b)(3) but in his reply brief he argued for
certification under Rule 23(b)(2).  His new theory is that the
Court should prospectively enjoin AT&T from enforcing the Wireless
Services Agreement's mandatory arbitration provision against
customers.

The Court would be within its discretion not to consider
McArdle's belated Rule 23(b)(2) argument.  See Emelianenko v.
Affliction Clothing, No. 09-cv-7865-MMM (MLGX), 2010 WL 11512405,
at *7 n.40 (C.D. Cal. 2010) (collecting cases in which courts

United States District Court
For the Northern District of California

declined to address arguments first raised in a reply brief).  In any event, McArdle has not met his burden of establishing the certifiability of the class under either subsection (b)(2) or (b)(3).

McArdle has not persuasively argued that his claims are typical of the absent class members.[5]  Whereas all customers were parties to the Wireless Services Agreement, AT&T actually tried to enforce the mandatory arbitration provision only against McArdle and perhaps a small handful of others.  Any harm McArdle suffered in the past by being forced to arbitrate was unique to him, and absent class members are not likely to suffer any harm in the future unless they sue AT&T.  See Hanon, 976 F.2d at 508 ("The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.") (citation and quotation marks omitted).  Even if typicality were satisfied, McArdle has not met his burden of showing that AT&T acted "on grounds generally applicable to the class."  Fed. R. Civ. P. 23(b)(2).  McArdle's issue is with the arbitration provision itself, not an ongoing AT&T practice.  Besides, McArdle does not need the Court to certify the Waiver Class for him to achieve the relief he seeks because he can pursue public

---

[5] Although the Court granted the parties leave to file overlong briefs, Dkt. No. 329, McArdle's argument for certification of the Waiver Class makes up less than four pages of his motion and reply briefs combined.

injunctive relief as an individual plaintiff.  See McGill, 2 Cal.
5th at 959.

McArdle's motion to certify the Waiver Class is denied.

CONCLUSION

For the reasons explained above, the Court GRANTS McArdle's
motion to certify the Roaming Class and DENIES the motion to
certify the Waiver Class.  Dkt. No. 301.  The following class is
hereby certified under Federal Rule of Civil Procedure 23(a) and
(b)(3):

> All California residents who, any time between February
> 6, 2005 and January 31, 2009, were charged international
> roaming fees by Defendants for unanswered incoming calls
> to their U.S.-based mobile numbers, except (a) customers
> who received refunds or credits and (b) for the class'
> CLRA claim, any customers who used their cell phones for
> business purposes.

The Court appoints Plaintiff McArdle as class representative
and Gutride Safier LLP as class counsel.

Additionally, the Court grants in part and denies in
part each of the three motions to seal.  Dkt. Nos. 300, 325
and 333.

Finally, the Court sets a case management conference for
2:30 P.M. on September 25, 2018.

IT IS SO ORDERED.


Dated: August 13, 2018

CLAUDIA WILKEN
United States District Judge